IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:21-CR-162 |
| v. | Hon. Michael S. Nachmanoff |
| KRISTOFER D. KNICKERBOCKER, | Sentencing: May 26, 2022 |
| *Defendant*. | |

### GOVERNMENT'S POSITION ON SENTENCING

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("Guidelines" or "USSG"), hereby provides its position with respect to sentencing of the defendant, Kristofer D. Knickerbocker. The defendant pleaded guilty to his role in a conspiracy to distribute methamphetamine throughout northern Virginia, as well as his possession of a firearm during and in furtherance of that conspiracy. The United States has no objection to the Probation Officer's calculations of the defendant's Guidelines, as set forth in paragraphs 51–71 and Part D of the Presentence Investigation Report (PSR) (ECF No. 92). For the reasons set forth herein, the United States respectfully submits that a term of incarceration of 120 months for Count One and 60 months for Count Four is appropriate in this case.

### BACKGROUND

In February 2021, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and Prince William County Police Department ("PWCPD") began investigating the distribution of methamphetamine in the northern Virginia area. Law enforcement determined that the defendant,

together with Cameron Harrup and Kimberlyna Sok, was distributing significant amounts of pure methamphetamine in Springfield, Virginia, and surrounding areas. A confidential source told law enforcement that the group was looking to expand its distribution network and that Knickerbocker, who was the group leader, possessed numerous firearms and spoke freely about modifying firearms to convert them to function as fully automatic.

Law enforcement conducted three controlled purchases of methamphetamine from Knickerbocker, Sok, and Harrup, between February and March 2021, purchasing over 46 grams of methamphetamine. Though only present for two of the three transactions, the defendant arranged each transaction through an encrypted messaging application, which is also how he and his co-conspirators communicated about drugs and guns.

The first controlled purchase took place on February 26 at a restaurant in Woodbridge, Virginia. Law enforcement observed Harrup arrive to Knickerbocker's residence in Springfield, Virginia. Harrup then drove Knickerbocker to the restaurant in Woodbridge, Virginia where the deal was set to take place. After all the parties arrived, the defendant, Harrup, an undercover officer, and a confidential source sat at a table to talk. Knickerbocker explained the prices for different quantities of methamphetamine and noted that it was from California. Knickerbocker said that he could get one type of methamphetamine for $1,200 per ounce or $13,000 to $14,000 per pound. He explained that a higher quality product would run $1,500 per ounce.

Knickerbocker shared that he had just purchased a piece of equipment from Pennsylvania that could make firearms, silencers, and drum magazines. Law enforcement later learned that Harrrup drove with Knickerbocker to Pennsylvania to transport the piece of equipment back to

Virginia. Knickerbocker also stated that he could modify firearms to make them function as fully automatic weapons and offered to make the undercover officer a fully automatic Glock for $500.

During the conversation, the defendant directed Harrup to conduct the transaction in the restaurant bathroom. Harrup and the undercover officer went to the restaurant bathroom where Harrup provided the undercover with two baggies containing crystal methamphetamine in exchange for $450. One baggie weighed approximately 3.5 grams and the second baggie weighed approximately 1.5 grams, totaling approximately five grams of methamphetamine. The analysis from the DEA laboratory confirmed that the first baggie contained approximately 3.37 grams of 97 percent pure methamphetamine and the second baggie contained over 1 gram of 99 percent pure methamphetamine.

Law enforcement conducted a second controlled purchase on March 9, 2021. The defendant told the undercover officer that he would be sending Sok to deliver the drugs to the undercover at the same Woodbridge restaurant where they met for the February 26 transaction. Sok and the undercover officer ultimately agreed to meet in the parking lot of a nearby grocery store because Sok could not find the restaurant. Sok arrived in the parking lot of the grocery store and entered the undercover's vehicle, where she handed the undercover a box of approximately 30 grams of methamphetamine in exchange for $1,200. The analysis from the DEA laboratory confirmed that the drugs were over 28 grams of 98 percent pure methamphetamine.

The third controlled purchase took place on March 18, 2021 in Knickerbocker's garage located in Springfield, Virginia, where Knickerbocker provided the undercover with approximately 15 grams of methamphetamine in exchange for $600. Sok was inside the garage bagging narcotics during the transaction. The defendant and Harrup spoke with the undercover

officer about methamphetamine and guns while standing next to a work bench on which several disassembled guns were located. The undercover asked Harrup whether he could make guns like the defendant. Harrup answered by saying that he was learning and did not have to ask as many questions as he once did. The defendant and Harrup spoke to the undercover about the source of the methamphetamine, noting that it was from an ex-Hell's Angel member. Knickerbocker continued to discuss guns with the undercover officer, explaining that he had all the equipment to manufacture weapons, including the piece necessary for converting firearms into machine guns. Knickerbocker told the undercover that he was modifying a gun for a gang member. The conversation switched back to the topic of drugs. Knickerbocker told the undercover officer that he could begin providing two ounces of methamphetamine per week. The analysis from the DEA laboratory confirmed the substance from the third transaction was approximately 14 grams of 100 percent pure methamphetamine.

The defendant was charged by criminal complaint on April 22, 2021. ECF No. 1. He was arrested the next day after being found by law enforcement at his home. During a search of the residence, law enforcement discovered 13 firearms as well as a significant quantity of various types of illicit narcotics and cash. On July 8, 2021, a federal grand jury returned a six-count Indictment charging the defendant with various offenses related to conspiracy to distribute methamphetamine and the possession of firearms. On February 8, 2022, the defendant pleaded guilty to Counts One and Four of the Indictment charging conspiracy to distribute 50 grams or more of methamphetamine (actual), in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). By the

date of the defendant's sentencing, May 26, 2022, he will have been in federal custody for approximately 13 months and 3 days.

## SENTENCING ANALYSIS

### I. Law on Sentencing

The Court consults both the Sentencing Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence. Although the Sentencing Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition to the purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4)

5

any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution. 18 U.S.C. § 3553(a).

## II. Guidelines Calculation

The government agrees with the Probation Officer that, pursuant to USSG § 2D1.1(c)(5), the base offense level is 30. The government also agrees with the application of the two-level reduction for acceptance of responsibility under USSG § 3E1.1(a). In accordance with the plea agreement, the government hereby moves for the additional one-point reduction under USSG § 3E1.1(b), which is already reflected in Probation Officer's calculations, leading to a total offense level of 27. PSR ¶ 71.[1]

The defendant's criminal history score is one. PSR ¶ 76. The defendant's total offense level of 27 and criminal history category I would yield an advisory Guidelines range of 70–87 months, but for the fact that Count One carries a ten-year mandatory minimum term of incarceration. Count Four carries a five-year mandatory minimum term of incarceration, to run consecutive to Count One.

## III. Section 3553(a) Analysis

Three individuals have been charged for their role in the conspiracy at issue, which involved the distribution of pounds of methamphetamine throughout northern Virginia. Mr. Knickerbocker was the leader of the conspiracy and was responsible for sourcing the methamphetamine, pricing decisions, and establishing and growing a distribution network for the

---

[1] The government believes that, based on the defendant's role in the offense as an organizer and a leader, the two-level enhancement under USSG § 3B1.1(c) applies. The government is not objecting to the Probation Officer's decision not to apply the two-level enhancement due to the mandatory minimum sentences that accompany each count.

methamphetamine. Another individual, Ms. Sok, packaged drugs, made deliveries, and helped find customers. Mr. Harrup also was involved in several aspects of the operation.

The defendant had several sources of supply of methamphetamine. When his sources were "dry," or out of methamphetamine, Harrup had a local connection of his own and he assisted the defendant by procuring large quantities of methamphetamine for resale directly from that individual. Even though it was Harrup's connection, the defendant remained in control of the operation and directed Harrup in how much methamphetamine to order from his source and what to pay for it. As noted in Count One of the Indictment, the defendant paid for methamphetamine from Harrup's connection at least three times. The defendant and Harrup first purchased only a few grams of methamphetamine to test the quality. During the second and third purchase from Harrup's connection, the defendant bought one-half pound of methamphetamine and one pound of methamphetamine, respectively.

Throughout the conspiracy to distribute pounds of incredibly pure methamphetamine, the defendant possessed multiple firearms to protect his drugs and his drug proceeds. The defendant maintained a garage on his property that he used to store drugs and guns. One of the controlled purchases took place in the garage. The defendant also used the garage as a workshop. He bought a mill and a lathe which he used to produce cylindrical parts that functioned as silencers, and small metal pieces that functioned as machinegun diversion devices, or "switches," that convert a semi-automatic firearm into a fully automatic firearm. He intended to sell the switches and even offered them for sale to an undercover officer. The defendant bragged that he sold a converted Glock handgun to a "gang banger." In addition to bringing Sok and Harrup into the conspiracy to

distribute methamphetamine, the defendant also showed Harrup how to use the machines to make machinegun conversion devices.

The defendant concealed a loaded Glock by mounting it under the workbench in the garage for easy access. During the search of the garage and the defendant's residence, law enforcement recovered a total of 13 firearms ranging from revolvers, shotguns, rifles, and pistols. Law enforcement located five machinegun conversion devices and silencers, several of which were found to be fully functioning.

The government acknowledges that the defendant has a relatively insignificant criminal history and that he appears to be a gracious friend. His extensive drug history is more consistent with recreational use rather than addiction. The defendant has a strong work ethic and a close relationship with his family. Notwithstanding his potential and admirable personal characteristics, he played a significant role in an incredibly serious offense. The defendant sold methamphetamine to an undercover officer on multiple occasions and distributed pounds of methamphetamine in his local community. At the same time, he was making dangerous firearms even more dangerous by modifying them so that they would shoot automatically more than one shot, without manually reloading, by a single function of the trigger. The nature and circumstances of the offense— distributing large quantities of dangerous drugs and converting firearms into machineguns— justifies a sentence of 15 years' imprisonment. The defendant's conduct evidences a disregard for the law and for human life. A 15-year sentence is appropriate due to the seriousness of the offense and the need to promote respect for the rule of law. Furthermore, the need to deter him from engaging in additional criminal conduct, the need for general deterrence of crimes of this nature, and the need to provide just punishment for this offense are all reasons why 15 years' imprisonment

is necessary to achieve an appropriate and just outcome in this case.

## CONCLUSION

For the reasons stated herein, the United States respectfully recommends a sentence of 180 months.

                Respectfully submitted,

                Jessica D. Aber
                United States Attorney

By:       /s/
                Rachael C. Tucker
                Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case; and I will further forward an electronic copy to the United States Probation Officer assigned to the case.

/s/
Rachael C. Tucker
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
Rachael.Tucker2@usdoj.gov